# WINDSOR COUNTY.

FEBRUARY TERM, 1874.

[Continued from vol. 46, page 749.]

---

Abraham Adams, administrator of Charles W. Chandler's Estate, *v.* Sewall Fullam.

[S. C. 43 Vt. 592.]

*Adverse Possession.*

The intestate and A. verbally made an exchange of lands, whereby A. was to have the demanded premises if he paid the difference in value between them and the land for which they were exchanged. A. went into possession of said premises under said contract, and occupied them for more than fifteen years, claiming no title thereto except by virtue of said contract, and had them set to him in the list, and paid the taxes thereon. A. never paid said difference, and no deeds of the lands were ever executed, and finally A. surrendered said premises to the intestate, and retook possession of the land he let him have. *Held,* that A. acquired no title to said premises by possession, and that after such surrender, he had no interest therein which could be taken on a debt existing before the surrender.

Ejectment for lot No. 9, in the 9th range in Weston. Plea, the general issue, and trial by jury, May term, 1873, Barrett, J., presiding.

The plaintiff introduced a quit-claim deed of said lot from Edward Simonds to the intestate, dated April 14, 1814, and recorded the 18th of said April, but gave no other record evidence of title either in Simonds or the intestate. The plaintiff gave evidence tending to show, that about 1820, Chandler cleared a portion of said lot, raised grain thereon, and used it for a pasture for several years, but to what particular time did not appear; that the lot was not set in the grand list until 1833, and was then set to Chandler, and continued to be set to him until 1837, when it was set to one John Adams, under whom the defendant claimed; that about that time, Chandler and Adams made a verbal contract, by

which Adams was to have said lot, and Chandler was to have a lot in Andover, called the McIntire lot, in exchange therefor; that Adams and Chandler at the time of making said contract, each went into possession of the lots exchanged for, and continued such possession until about 1850 or 1851, and that no writings or deeds of said lots were made or passed; that about the time of Adams's failure, February 12, 1851, Chandler and Adams agreed to give up said contract, and each take back said lands, for the reason that Adams was not to have a deed of said lot until it was paid for, and it had not been paid for; that Adams took in cattle from Chandler, to keep, for several years, and pastured his own stock there from the time of said contract up to about 1848 or 1849, when the pasture ran up to brush so as not to be worth the expense of repairing the fence around it; that Adams was not to become the owner of the lot under said trade unless he paid for it, and that he never paid for it, and that the trade was given up in 1850 or 1851, and Chandler then resumed the possession of the lot in question, and Adams of the other lot; and that Adams exercised no possession or control of the lot in question, after the trade was thus thrown up, and laid no claim to it except under said contract. It appeared that said lot was inventoried in 1850 as part of said Chandler's estate.

The defendant gave evidence tending to show, that Adams pastured his horses in said pasture in 1834 and 1835; that in 1837, said lot was listed to Adams, and continued set to him to and including 1851, and was set to him in the list of 1852 when the list of that year was made out, but was afterwards changed, and set to Chandler; that Adams paid the taxes on said lot all that time, and claimed to own it, and was understood to be the owner thereof by the community thereabouts during all that time and for several years thereafter; that he built from 60 to 100 rods of stone wall thereon during that time, and pastured his horses and cattle there, and kept stock for other people at various times; that he sold timber therefrom as late as 1853, and offered to in 1854; that Chandler told the defendant on July 3, 1839, that Adams bought said lot, and had paid for it, and that Adams told him the same at different times before his failure, and that the defendant

never knew or heard of any claim on the part of Chandler, or his estate, to said land, until Chandler had been dead ten years or more ; that on the failure of Adams, his creditors attached said lot, to secure their debts against him ; and that Adams fully paid for said land, and took a deed of it from Chandler, which had never been recorded ; that previous to 1849, Adams had become indebted to the defendant in a considerable sum, and that near the end of December of that year, the defendant loaned him $300 for a short time, and that it remained unpaid to the time of his failure ; that in the spring of 1856, and after said attachments had been removed, the defendant commenced an action against Adams on said indebtedness, and attached said lot, and at the May term, 1856, recovered judgment for $591.16 damages, and $13.78 costs, and Nov. 20, 1856, caused an execution founded on said judgment to be levied upon said lot, and the same to be set off in part satisfaction thereof ; that the same was set to him in the grand list of 1858, and had so remained to the time of trial, and that he had paid the taxes thereon, and during all that time had been and still was in possession thereof ; that Chandler died January 9, 1853, and that May 10, 1864, the plaintiff commenced an action of ejectment in the name of one Levi Ives against the defendant and two others, to recover possession of said lot, which action he did not enter in court, but commenced this action. The defendant also gave evidence tending to prove, that Adams failed February 12, 1851, and was still insolvent, and that about that time, and as a part of that transaction, he deeded his home farm and six other pieces of land in Andover, for the expressed consideration of $3,900, to his brother Warren Adams, one of which pieces was said McIntire lot ; that on the same day, he deeded to said Warren seven-eighths of lot 19 in the 8th range in said Andover, in consideration of $200, and also on the same day deeded to said Warren three pieces of land in Chester, for the consideration of $800, and at the same time the said Warren bought and took away the stock which Adams had upon said farm ; that the plaintiff, John, and Warren, were brothers, and that Abraham's wife was the daughter of said Chandler ; that Abraham assisted in transferring said property to Warren ; that Chandler

was an old man, and had been a paralytic for several years before said failure, and not able to do much business; and that said John had, with the exception of a few months, resided upon said home farm in Andover ever since his failure, and still resided there.

The plaintiff, by way of rebuttal, gave evidence tending to show that at the time of executing said deeds, the said John was indebted to said Warren, but what said indebtedness was for, or what was the amount, did not appear; and that as a further consideration for said deeds and sales, the said Warren agreed with the said John to pay a debt due from said John to one Nathaniel Lord, a debt due to one Lucinda Puffer, and a debt due to the Bank of Black River, none of which parties were present at the time of said contract; but what the amount of said indebtednesses was, or what they were for, did not appear; nor did it appear that he had paid the same.

The court held that as both parties claimed under Chandler, it was to be assumed that his title was good at the time of the trade between him and John Adams in 1837; and instructed the jury that if said trade was a bargain for a sale or exchange of the land in question, and it was understood by the parties that said Adams then became the owner, and upon such understanding Adams went into possession and held possession for fifteen years, the title became perfect in him, and it was subject to the levy on it made by the defendant, and the plaintiff could not recover: but that if the bargain was that if Adams was to become the owner when he paid for it, and was then to have a deed, and he did not pay for it, and in 1851 or 1852 it was agreed between them the matter should be given up, and Chandler resumed possession of the lot in question, and Adams resumed possession of the other lot, then Adams did not get title. In all other respects the charge was such as the case called for, and no exceptions were taken to it. To the refusal to charge as requested, the defendant excepted.

The defendant *pro se*, with whom was *J. F. Deane.*

The facts which appear in the case, gave notice to the world that Adams was the owner of this land, and his creditors acted and thought accordingly. It was not for Chandler or his repre-

.71

sentatives, after this, to claim that there was a secret understanding by which if some indefinite sum was not paid he could take it back on the sly. If they could so take it back at all, it should have been by deed duly recorded. But not so; Adams sold timber off it, and offered to sell more, and no one heard or dreamed of any claim in them for more than ten years. We think, therefore, that the defendant was entitled to the charge requested. The plaintiff did not pretend to show what was due, if anything, by the original trade, so as to let in creditors to attach defendant's equitable interest. This whole proceeding was a fraud in law and a fraud in fact, and cannot be sustained at all events against creditors. We insist that as this case stood, it was error to charge the jury " that as both parties claimed under Chandler, it was to be assumed that his title was good at the time of the trade between him and John Adams in 1837." We do not claim title under Chandler, stricly speaking, and not necessarily at all. By their own showing, he had nothing but an inchoate title to the premises; this he might convey by parol and a transfer of the possession. But we claim under Adams as his creditor, and claim that he had a possessory title ; we are in possession and cannot be put out, but by a good title. This is not an ordinary case of two parties claiming title under the same grantor ; there is reason in such a case, in holding that it is to be assumed that the grantor's title is good. Such assumption can only be made by deed or record, or where a denial of a fact will be in bad faith ; such is not this case. But we do say that the intestate, and those claiming under him, are estopped, by his own acts and admissions, to set up a title to the land upon the ground which the plaintiff now claims.

*F. C. Robbins,* and *Walker & Goddard,* for the plaintiff.

There was no record to show the contract otherwise than as claimed by the plaintiff and found by the jury ; nor was the possession inconsistent with it. Therefore, we insist, the creditors of John Adams cannot complain ; they could not have been misled by the contract, nor the grand list, nor the possession. The case shows that the defendant was not misled. His attachment was not made till five or six years after Adams and Chandler had

thrown up the contract, and several years after the land was again set in the grand list to Chandler, and while in the possession of his administrator. The defendant cannot by his attachment and levy, make a title in the premises for John Adams which he had not acquired from Chandler. It is a well-settled principle of law, that an attaching creditor acquires by his attachment and levy, only such title in the premises as rested in the debtor. *Somes* v. *Skinner*, 3 Pick. 56 : *Wade* v. *Howard*, 6 Pick. 497 ; *Hunt* v. *Hunt*, 14 Pick. 374 ; *Hitchcock* v. *Hotchkiss*, 1 Conn. 472. The request asked the court, really, to hold these two propositions as law, viz : 1st, that mere possession of land for fifteen years, with the same set to the occupant in the grand list, will give the occupant such color of title that his creditors can hold it by levy against the *de facto* owner ; 2d, that fifteen years' possession of land under an agreement that the person in possession shall have the premises if he pays for them, but does not pay for them, is adverse, and will ripen into a perfect title against the vendor, even if the person in possession never claimed to own it otherwise than upon the contingency of his paying for it. The request asked the court to rule the law directly the reverse of the charge, which the defendant did not except to ; and also against the law as heretofore held and settled in this same case. 43 Vt. 592. The possession of John Adams constituted a possession in Chandler ; for until the actual conveyance, the vendee of land stands in the relation of tenant or *quasi* tenant to the vendor. *Greeno* v. *Munson & Munson*, 9 Vt. 37 ; 4 Met. 224 ; 1 Washb. Real Prop. 389 ; *Hall* v. *Dewey et al.* 10 Vt. 593 ; *Spear* v. *Ralph*, 14 Vt. 400 ; *Ripley* v. *Yale*, 18 Vt. 220 ; *Robinson, admr.* v. *Sherwin, exr.* 36 Vt. 69.

The opinion of the court was delivered by

Ross, J. The only exception is to the refusal of the court to charge as requested. The defendant claimed title to the premises by a levy and set-off on an execution in his favor against John Adams. John Adams derived his title, if any, to the lot, from the intestate, or by adverse possession against him. The plaintiff's evidence tended to show, that the intestate and John Adams

made a conditional exchange of lands, by which John Adams was to have the lot in question if he paid the difference in value between the lands exchanged, and that thereupon John Adams took possession of the lot in question, and occupied it over fifteen years, had it set to him in the grand list, and paid the taxes. Never having paid the difference agreed upon, he finally surrendered the lot to the intestate, and took possession of his own lot. No deeds had ever been executed of the premises so exchanged. If the plaintiff's evidence was to be credited, John Adams's occupancy and possession of the lot was under the title of the intestate, and in subordination to it, and not under any claim of title in himself as against the intestate. His right to title to the lot from the intestate, depended upon the performance of the condition attached to and made a part of the exchange, by the payment of the difference in value of the two premises. The defendant, under this state of the evidence, requested the court to charge the jury, that the occupancy by John Adams, of the lot for fifteen years, and having the same set to him in the grand list, gave Adams a good title, even though such occupancy was by the permission of the intestate, and that no understanding between Adams and the intestate would prevent the creditors of John Adams from holding the land. The request has no foundation in law. It is the adverse character of the possession and the claim of title by the occupant, that give one title against the legal owner by fifteen years' possession. A person can never gain title to land by possession thereof, however long continued, if that possession is with the permission of and in subjection to the holder of the legal title to the premises. A creditor, by attachment and set-off on execution, can obtain no greater rights to land than the debtor has. Sometimes it happens that the debtor, by his own fraudulent acts, has placed himself in such a position that the court will not aid him to assert his rights, and yet will aid his creditors in asserting them. In such cases, the creditors can take only that right to the land which is in the debtor, and which the debtor could assert if it were not that in so doing, he must be heard to assert and prove his own fraud.

Judgment affirmed.